```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )     Criminal No. 04-10167-RCL
                              )
         v.                   )
                              )
TROY BREWER                   )
         Defendant.           )
```

## GOVERNMENT'S TRIAL BRIEF

The United States of America, by its attorneys, Michael J. Sullivan, United States Attorney for the District of Massachusetts, and David G. Tobin, Assistant U.S. Attorney, hereby provide to the honorable Court a Trial Brief in the above-captioned case.

## CHARGES

The defendant is charged with conspiracy to possess with intent to distribute, and to distribute, hydrocodone, in violation of 21 U.S.C. § 846; possession with intent to distribute, and distribution of, hydrocodone, in violation of 21 U.S.C. § 841(a)(1); and aiding and abetting, in violation of 18 U.S.C. § 2. The superseding indictment also contains a criminal forfeiture allegation pursuant to 21 U.S.C. § 853.[1]

## EVIDENCE

The United States expects the evidence will prove that on or about March 3, 2004, the defendant conspired with Adam Ellard,

---

[1] At this time, the United States does not anticipate pursuing the criminal forfeiture allegation.

and Timothy Herlihy to distribute one thousand Vicodin tablets, and distributed approximately one thousand Vicodin tablets. Vicodin is a prescription medication containing hydrocodone, a Schedule III controlled substance.

This case arises out of a Drug Enforcement Administration ("DEA") Mobile Enforcement Team operation on the North Shore of Massachusetts.  On March 4, 2003, undercover DEA Special Agents ("SAs") David DiTullio and Dan Genese were introduced to Katie Bertalino by a Peabody Police confidential source.  The purpose of the meeting was to arrange the purchase of one thousand Vicodin tablets from Bertalino.  SAs DiTullio and Genese negotiated a price of $6.40 for each tablet.  During the negotiations, SA DiTullio also inquired about purchasing one-half ounce of "crack" cocaine.[2]  Bertalino stated that she would be able to do the deal the next day at noon.

The following morning, March 4, 2004, at approximately 10:00 a.m., SA DiTullio placed a call to Bertalino to inquire about the planned deal.  Bertalino told SA DiTullio that she had not heard from her source of supply and that she would call SA DiTullio back later.  Later that morning, SA DiTullio received a call from an individual who identified himself as "Alex."  During the course of the conversation, Alex revealed that he was Bertalino's source of supply for Vicodin and that SA DiTullio could deal

---

[2]"Crack" is a term for cocaine base.

directly with him and receive a better price on the Vicodin and "crack" cocaine.  SA DiTullio agreed to deal with Alex and plans were made for the two to meet later that day in Revere to conduct the sale.  SA DiTullio told Alex that he would be coming with a friend, referring to SA Genese.  Alex told SA DiTullio that he too would bring a friend.

After a period of time, SA DiTullio received a second call from Alex.  SA DiTullio told Alex that he was about a half hour from Revere.  Alex told SA DiTullio that he had not had time to cook the "crack."[3]  SA DiTullio told Alex that he would get the "crack" at a later time.

SAs DiTullio and Genese drove to the Square One Mall in Saugus, and called Alex.  SA DiTullio informed Alex that he wanted to do the deal at the Square One Mall.  Alex told SA DiTullio that he wanted to do the deal at the Northgate Mall.  SA DiTullio agreed and he and SA Genese drove to the Northgate Mall.  Upon their arrival, SA DiTullio placed another call to Alex.  SA DiTullio and Alex agreed to meet at the Pizzeria Uno restaurant.  SAs DiTullio and Genese drove to the restaurant and waited in the bar area.

A DEA surveillance team was posted outside the Pizzeria Uno restaurant.  At approximately 1:40 p.m., a member of the

---

[3] "Crack" is made by a process that includes heating or "cooking" cocaine.

surveillance unit observed a Toyota 4Runner arrive at the restaurant with three male occupants.  They were later identified as Timothy Herlihy, the driver and lessee of the vehicle, Adam Ellard, and the defendant.  The defendant and Ellard were observed to get out of the vehicle and enter the restaurant.  Herlihy stayed in the vehicle in the parking lot.

   SAs DiTullio and Genese observed the defendant and Ellard enter the bar and SA DiTullio motioned to them.  During the introductions, Ellard stated that his name was not Alex, but was Adam.  Ellard introduced the defendant as his "partner."  During the ensuing conversation Ellard spoke freely about drug selling and told SAs DiTullio and Genese he had been in the drug business for thirteen years.  The defendant was present for the drug related conversation.  Ellard suggested that he and DiTullio go outside to talk.  SA Genese and the defendant remained in the bar.

   Ellard led SA DiTullio to the Toyota 4Runner. Herlihy, who was seated behind the wheel, put down the passenger side window and Ellard introduced Herlihy to SA DiTullio.  Ellard identified Herlihy as "Meatball" and told SA DiTullio that Herlihy was his "runner."  While standing outside the Toyota 4Runner, Ellard and DiTullio discussed the one thousand Vicodin deal.  Ellard wanted SA DiTullio to put up one-half the money ($3,200) and Ellard said that he would put up the other half of the money.  Ellard

explained that Herilhy would take the money up the street and pick up the Vicodin tablets. SA DiTullio refused to give Ellard the money. Eventually Ellard gave Herlihy the $3,200 Ellard had brought with him and Herlihy drove away to pick up half the Vicodin.

Surveillance agents followed Herlihy to a condominium complex near Revere Beach. Herlihy drove into the first level of a parking garage and was observed a short time later driving slowly around the garage with an unidentified male in the 4Runner. Surveillance of the 4Runner was momentarily lost and when it was resumed Herlihy was observed leaving the area without the passenger.

After Herlihy left the parking lot to pick up the Vicodin tablets, SAs DiTullio and Ellard went back into Pizzeria Uno and met the defendant and SA Genese. The conversation centered around a future deal involving the drug Ecstacy. During the conversation, Ellard stated that he does things carefully because if he gets arrested again, he will go to jail for life. The defendant agreed with Ellard and re-stated that if Ellard gets arrested he will go to jail forever.

After a period of time, Ellard placed a call to Herlihy and announced that Herilhy would be there in a few minutes. At that time, they paid the bill and departed the restaurant. Once outside, Ellard placed a second call to Herlihy and announced

5

that Herlihy was pulling into the lot.  Ellard stated after SA DiTullio got the first five hundred tablets, SAs DiTullio and Genese could follow him up the street to a Blockbuster Video to get the other five hundred tablets.  The defendant and Ellard then got into the 4Runner which had arrived at the lot.

   SA DiTullio walked to a nearby vehicle and got $3,200 in cash from a DEA Task Force Agent Clarizia.  SA DiTullio then approached the rear passenger side door of the 4Runner.  Ellard opened the door and invited SA DiTullio to get into the vehicle to observe and count the tablets.  DiTullio joined the defendant, Herlihy, and Ellard inside the 4Runner and was handed a bag containing numerous blue tablets.  SA DiTullio told Ellard to drive to the parking lot exit.  SA Genese pulled his vehicle behind Herlihy's car and followed the 4Runner.  SA DiTullio fingered the tablets, and handed Ellard $3,200 in cash.  Herlihy stopped the 4Runner and SA DiTullio got out and got into the undercover vehicle operated by SA Genese.  SAs Genese and DiTullio followed the 4Runner to a nearby Blockbuster Video store.

   Once at the Blockbuster Video store parking lot, Ellard and Brewer were observed getting out of Herlihy's 4Runner.  Herlihy drove the 4Runner from the parking lot and was followed by a surveillance team to the same condominium complex near Revere Beach.  SA DiTullio called Ellard and was informed that Herlihy

6

and Brewer had gone to pick up the other five hundred tablets. After a brief period of time, Herlihy returned to the Blockbuster parking lot.

After parking the 4Runner, Herlihy got out and walked toward the undercover car. SA DiTullio got out of the undercover car and told Herlihy that he was waiting for his girl to come with the money. Ellard exited the Blockbuster and approach the 4Runner. Ellard then walked over to the undercover car and got into the backseat. Once inside the car, Ellard opened a white bag in which there was a clear bag containing numerous blue tablets. At that time, SA DiTullio called DEA Task Force agent Clarizia and instructed her to come to the Blockbuster with the remaining $3,200.

While they waited for Task Force Agent Clarizia to arrive, Ellard stated that his "partner" Troy was a gentleman and a trustworthy guy he has known for years.[4]

SA Genese observed Task Force Agent Clarizia drive into the parking lot. SA Genese got out of the undercover car, retrieved the cash, and got back into the undercover vehicle. Ellard handed SA DiTullio the bag with the Vicodin tablets and SA DiTullio handed Ellard the $3,200. Ellard exited the undercover car and returned to Herlihy's car, where he re-joined Herlihy and

---

[4] Ellard's comment about his "partner" Troy were recorded by a recording device worn by SA DiTullio. The United States will introduce this portion of the audio-tape into evidence.

7

the defendant.  A surveillance team followed the 4Runner to a location in Salem, where Ellard entered a building for a brief period of time.  Herlihy was then followed to a Revere train station, where he dropped off the defendant and Ellard.

### **TESTIMONY OF ADAM ELLARD**

Adam Ellard has pled guilty to conspiracy and distribution charges arising from this case.  Ellard's plea was pursuant to an agreement he made with the United States.  Ellard was separately indicted on charges stemming from subsequent distributions of "crack" and cocaine.  The separate indictment did not name the defendant.  Ellard has also pled guilty to the charges in the second indictment pursuant to an agreement with the United States.  Ellard has not been sentenced on either indictment.  Copies of Ellard's two Plea Agreements are attached.

Ellard will testify at the defendant's trial.  The United States expects Ellard to testify as follows:  He and Brewer met and became friends for a number of months in 2001.  Ellard did not see Brewer again until January or February, 2004, after Timothy Herlihy gave Ellard Brewer's telephone number.  Ellard and Brewer spoke over the telephone and Brewer came to visit Ellard in the Dorchester apartment where Ellard was living with his girlfriend and her mother.  Brewer lived in the Dorchester apartment with Ellard, Ellard's girlfriend, and the girlfriend's mother until March 24th or 25th.

8

During the time Ellard and Brewer lived together in Dorchester, neither one had legitimate employment. Ellard provided Brewer with "crack" cocaine and cocaine. Ellard and Brewer did drugs together. Ellard smoked "crack." Brewer smoked "crack" and snorted powder cocaine. Ellard periodically gave Brewer money. Ellard offered to make Brewer a partner in his drug selling business and Brewer delivered drugs to customers, as well as picked up and delivered drug proceeds. Ellard introduced Brewer to people Ellard used to sell drugs for him.

Ellard had given cocaine to Katie Bertalino a couple of times. Two days before the deal, Bertalino called Ellard looking for one thousand Vicodin and asked about prices for "crack" cocaine. Ellard told Bertalino he would provide her with the Vicodin. Ellard had no contact with Bertalino the next day. The following day, Bertalino called Ellard to inquire about the Vicodin. Ellard told Bertalino he would check out her customer and got DiTullio's phone number from Bertalino. Ellard decided to do the deal without Bertalino and later called Bertalino and told her not to deal with DiTullio. Ellard spoke over the telephone with Timothy Herlihy that morning to arrange to get the one thousand Vicodin.

Ellard first told Brewer about the one thousand Vicodin deal the first day he had contact with Bertalino. Ellard told Brewer the profit would be one thousand dollars. Ellard and Brewer took

public transportation to the Wonderland MBTA stop, where they were picked up by Herlihy. They then drove to the meeting place. Once inside the restaurant, Ellard introduced Brewer as his partner. Ellard considered Herlihy his partner.

After the second sale, Ellard, Brewer, and Herlihy went to Salem where Ellard paid the cocaine supplier and purchased more cocaine. Brewer delivered some of that cocaine later that night to customers and used some of the remaining cocaine.

Brewer moved out of the Dorchester house shortly after Ellard's "crack" cocaine sale to DiTullio at the hardware store. Brewer did not accompany Ellard on that sale because he was back at the apartment under the influence of drugs.

The defendant was arrested on June 1, 2004, in Everett, Massachusetts, by Everett Police Officer Cuthbert. Officer Cuthbert, aware that there were active warrants for the defendant's arrest, approached the defendant outside a Walgreens Pharmacy. When the officer approached the defendant and asked if he was Troy Brewer, the defendant lunged forward and punched the officer in the left temple. The defendant then attempted to flee. The officer was able to take the defendant into custody with the assistance of a civilian.

## STIPULATION OF FACT

The parties have agreed to stipulate that the tablets purchased by SA DiTullio on March 3, 2005, were Vicodin, a

prescription drug containing hydrocodone, a Schedule III controlled substance.  A copy of the proposed stipulation is attached.

### Fed. R. Evid. 404(b)

The United States submits that Adam Ellard's testimony pertaining to the defendant's drug use and drug selling activities, as outlined above, is admissible under Fed. R. Evid. 404(b) to prove the defendant's motive, intent, plan, knowledge, and absence of mistake.  The defense has indicated that it will pursue a "mere presence" defense strategy.  The United States contends that the defendant and Ellard were "partners" in a drug selling operation and that the defendant was present at the deal to render aid and assistance if such aid and assistance became necessary.  The defendant's partnership interest in the charged deal, his intent with respect to the deal, as well as his participation in the deal are readily proven by testimony as to the relationship he had with Ellard.  The United States has no intention of presenting any evidence on its direct case as to the defendant's criminal acts that do not involve drug activity with Ellard.

### ARREST

The United States intends to introduce evidence through Everett Police Officer Cuthbert that the defendant resisted arrest, assaulted a police officer, and attempted to flee.  The

11

United States submits that the defendant's actions constitute his consciousness of guilt and are admissible.

**WITNESSES**

The United States anticipates calling the following witnesses:

1. DEA SA David DiTullio;
2. DEA SA Dan Genese;
3. DEA SA Steve Story [investigation background and surveillance].
4. Adam Ellard

The United States may call the following witnesses:

5. DEA SA Clem Fisher [surveillance];
6. DEA Task Force Agent April Clarizia;
7. DEA SA Paul Karamourtopoulos [evidence custodian];
8. DEA Group Supervisor Richard Guerard [surveillance]
9. DEA Task Force Agent Sucharski [surveillance];
10. DEA Task Force Agent Tibert [surveillance]; and
11. Everett Police Officer Cuthbert (# 107)[defendant's behavior when arrested].

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        United States Attorney

                              By:  */s/ David G. Tobin*
                                        DAVID G. TOBIN
                                        Assistant U.S. Attorney

Dated:  May 19, 2005